We'll call our second case, 23-1094, Port Hamilton refining and transportation v. US-EPA. Mr. Simpson, how are you? Good morning, your honor. May it please the court. I have to talk to my booking agent about booking me after the headline act. Yeah, it's a tough elective problem. I'm also going to ask you to speak up. A lot of people are watching these arguments on a remote link and they can't really hear us unless we really speak up. Okay, I'll try to do better with that. May it please the court, my name is Andrew Simpson. I represent Port Hamilton refining and transportation, triple LP. I'd like to reserve three minutes for rebuttal. Sure. Are three... Can you repeat it? Yes, will you ask something? Go ahead. No, sir. You, as your opponent, and probably better, it has to, your opponent, but reading this in the record, I'm a little bit confused. In 2018, there was a determination, basically this was not reconstruction, by the EPA made that determination, and that if you were to, I think it was said, that if you were to resume operation, it would not constitute a new stationary source under the current reactivation policy. That's quoting in part from the 2018 binding letter, I guess. And then, I guess, the EPA record was withdrawn, and all of that went away, and all of a sudden, your, I guess the term restarting, I know that's the contention here, but your attempt to go back online, if you will, was in fact determined to be reconstruction. What happened in 2018 and 2022 to change things? I think, just, I'd like to answer your question, but just to be clear, the 2018 record was not withdrawn. In between, there was a plan-wide applicability permit being requested, and that record was withdrawn. It's called the payroll record was withdrawn. Wasn't that payroll record based upon, at least in part, the 2018 determination that this was not reconstruction? It absolutely was, and not only that, I think it's important to realize that the public comment that is responded to by the EPA in 2020 is responding to additional information provided by a member of the public talking about the early comments made by OVENSA, whether it was intended to shut down or not, and they are addressed in that 2020 response and rejected. When 2022 comes along, I think the only thing that has changed as an administration is now we're told, well, that wasn't before the EPA in 2018. Perhaps, perhaps not, but we know it was in front of the EPA in 2020 when they reaffirmed the 2018 determination because they specifically address the various comments that were made by OVENSA and say, that does not change our opinion. The overwhelming evidence of intent to restart is present. Mr. Simpson, if I could jump in here from out in the less equitable climes than St. Croix, where I happen to be located right now, I'd like to just make sure that we're talking about the same applicable legal framework here, so-called order of battle, if you will. So if I understand it from your brief, your position, of course, is that the reactivation policy is invalid, and you maintain that it would be invalid under both Chevron and our. Am I correct? Yes, you are. I mean, so don't we then first ask if EPA's regulation, that is Section 52.21, is entitled to deference under Chevron, and if it is, then we ask if the reactivation policy is a reasonable construction of that regulation under our. Is that our framework here? Yes. I think it would start with the statute, not with 52. Right. Absolutely. We don't get to the reactivation policy if EPA is not authorized to have that. Exactly. Thank you. So I understand your position correctly. Thank you. Yes. Let me ask this. Assume, looking historically at what happened the last time the plant started up, if you were right and the plant starts up again without going to the hurdles that EPA is setting, you have to have new construction. And let's assume that an environmental, I wouldn't say catastrophe, but I will say catastrophe, an environmental catastrophe happens soon after the plant starts up, as happened in the past, and I don't expect you to accept that characterization of what happened. What should EPA do? Should they step in with emergency authority that can shut you down at that point? I know that's not an issue for us, but it seems to me your history, in terms of what has happened to the environment when you started up, is not very good. And I assume that's what's driving EPA's concern here. I'm going to assume that's partially driving it. Of course, that was not my client that started it up and had the problems. Right, but you're right. The plant's the same. It's not a new construction. It's the same plant. It is not new construction. That is certainly the case. And the point is that this is a pre-construction statute. It's designed to put in emissions limitations on new construction. But EPA has an arsenal of weapons to use in a case where we violate the Title V permit, we release emissions that exceed our limits. So the EPA doesn't need this hammer. It has lots of other hammers. After the audit is done? Well, they have the power to come in and conduct audits. They did the audits that they did after. They could have done the audits before the line 2A began operating. But you're saying they can come in and do an audit before you begin operation? Yes. The General Duty Clause audit that they did, they can do that. They came in after the fact and audited Port Hamilton? Well, you said after the fact. I'm trying to figure this out how this works. Are you saying that they have the authority to come in before you start up? I don't know if you have to get a notice from them before you start up or not, but it sounds like you do. Before you start up, they can come in, audit the filters, the facility, everything else, and make a determination that if you're allowed to go forward, it's going to result in an emission that exceeds permissible standards and, therefore, can keep you from starting up. Is that what you're saying? I can't get into the specifics of all the different ways they can do it. But who is that? Yes, they can come in. They did it to Port Hamilton. So they came in after Port Hamilton purchased the refinery. This is a completely new operation. And they said, we've got concerns about the ammonia that's stored in the premises, and we want that addressed. And we intervened through a consent decree. We had grounds to fight them on it. So now it needs to be addressed. We're going to address it. So there's lots of different ways the EPA can deal with a refinery once it's constructed. It is not locked in time. Once it's constructed before it starts operating. Correct. Well, how would you characterize the current status of the refinery? Is it still idle? It is still idle. We can't do very much right now because PSD is a pre-construction requirement. If we begin doing the things we want to do to proceed to the recommencement of operations, we face a potential action by the EPA. Mr. Simpson, you just used the term pre-construction. Did I hear you say pre-construction requirement? Was that the phrase you used? Let me return to the Chevron issue, if I may. And I believe that your position is that the term construction, as it's used in 74-75 of the Clean Air Act, unambiguously refers to a new facility. Is that your position? Yes, it refers to construction commenced after August 7, 1977. Correct. Right. So what do you do with the inclusion of the word includes in the statutory language here? It has been added to, appended to, if you will, the term construction. What does that do in terms of the ambiguity well-known argument here? I don't think it does anything, given the history of the statute. So the Clean Air Act amendments of 1977 are adopted after extensive congressional debate, extensive debate saying we are grandfathering existing facilities. That language about includes modification is not included in the 1977 Clean Air Act amendments. That is a correcting amendment that comes along about nine months later, as I recall. And what it does is it says we recognize that an existing facility may undergo a modification. Okay, so clearly it extends the word construction from simply new build, right? I mean, it makes it somewhat broader, though we don't know how much broader, do we? Well, I think we do because Congress says it applies in a situation where an existing facility is modified in a manner that increases emissions. So there's no silence for an existing facility where the emissions are not increased. Congress has said, here's the line, this side of the line, you have a PSD review, this side of the line you don't. That's not silence. So our major issue then here, the issue that you are tackling is just whether or not the PSD program applies to a restarted facility, right? Yes. And so do you have evidence in the legislative history or otherwise that suggests that Congress spoke directly to that question? That is, whether or not the PSD program does apply to a restarted facility? We do. As I said, the legislative history is replete with references to grandfathering existing facilities, stating it applies only to new facilities. You have the visibility amendments that were adopted as part of the same 1977 Clean Air Act amendments. And there Congress said, we are going to apply these visibility amendments to existing facilities. And they even went so far as to give the EPA specific statutory authority to develop regulations for the applicability of that. So they do that. But when it comes to the pre-construction section of the same amendments, they don't do that. And I think that speaks volumes as to what Congress's intent was. What do you make of the Supreme Court's recent cert grant in the Loeber case? A lot of people see it as a challenge to Chevron deference. What do we do with that, if anything? I don't think you need to do anything with it. First of all, I don't think Chevron deference applies, period. Because this is not a rule. This policy does not have the force of law. EPA acknowledges it's applied on essentially a basis that is non-binding. So sometimes they apply. Sometimes they don't. And in Christianson v. Harris County, the Supreme Court spoke to that and confirmed it again or restated it in Mead, in which it said an agency action that does not have the force of law does not get Chevron deference. So I don't think we get to that at all. Well, Chevron could apply. But that doesn't mean we give Chevron deference. Under Chevron, if the statute is 7475, if it is unambiguous, then there is no Chevron deference. That also. And I don't think it is ambiguous. It's not even where Congress said it knew. It put a specific date on when it came out. Let's assume we don't agree with you, though, on the Chevron issue. Let's assume that we are required to move on from Chevron deference, then. Isn't the regulation that's at issue here, 52.21, a reasonable construction of the statute? So you're talking about step two of Chevron? Yes. And no, because the rule doesn't have a reasoned analysis. It's an ad hoc policy that has been cobbled together over a series of administrative decisions. And the decisions don't even cite 7475A. So it's like EPA is acting in a vacuum and not even considering what the statute itself says. None of those decisions explain how EPA arrived at a construction that says 7475A, coupled with the modification rule, allows us to extend this to an existing facility that has not undergone such a modification. So I don't think we get to Chevron. I think we prevail at step two of Chevron as well. Well, all right, I'm beyond Chevron now. But let's go on to the hour deference issue. I don't think they're entitled to hour deference either. Now we're going to the regulation. And it talks about new facilities and modified facilities. It's basically tracking the language of the statute. There's nothing in the regulations that defines new in the way that the EPA is doing it here. In fact, new in the regulations is modifying facility. And my colleague in the brief is arguing that new refers to new emissions. And that's just not in the statute. It's not in the regulations. I don't know how you can give an hour deference to that. All right. Anything else, Judge Smith? No, thank you. Thank you, sir. Thank you. Good morning. Is this Gange? Gange. Gange. Good morning. I'm going to introduce the clerk. I have with me a council table. Mr. Justice Siegel. I'm going to ask you to speak up. A lot of people are listening in other places. Yeah, I don't have Joe here with me, too. Okay. Is this better? Much better. Okay. There we are. There are a number of issues that I think are important to address today. But the first one that may help the most is to make sure that we have the same understanding of, I think, what Judge Whiteman called the framework that we're working in. The authority for EPA's decision-making in the letter that's being challenged today is not the reactivation policy. Is that correct? Is not the reactivation policy. EPA is relying solely on 40 CFR section 5221A2 as the authority for the decision that they reached. But isn't 54, 5221, you're saying not relying on 5221. I'm sorry, Your Honor. You're saying you're not relying on 5221A2. EPA did rely upon section 5221A2 as the authority for its decision. The reactivation policy is an organizational one. Are you saying that the difference or the change of mind changed position between 2018 and then now? Chronology is extremely important there. The 2018 letter itself was not a final PSG determination. And EPA was careful to say that it was based on information and representations that were made by one tree at a time. In 2020, when the Powell comment was issued, they said again that the information was partially the record for the 2018 letter and also additional information and representations. But what is the information? What morphed a plant that had been in existence to one that actually was now new and was now being reconstructed? Chronology and knowledge are incredibly important here. The Powell permit and the record, they were when, Your Honor, if I could, I think this would be very useful. I want to say we can't hear you. Here, is this helpful? Thank you. Yeah, let me jump in here, please, because I am having some difficulty hearing counsel, at least when she drops her voice. So if you would speak directly into the microphone, please. I'll do my best. The 2020 Powell comment was withdrawn before it ever became effective. It was withdrawn in the early days of the series of catastrophes that occurred when Lime Tree tried to restart the refinery. When Lime Tree attempted to restart its refining, after the emergency order issue that made them shut down, there were a series of audits and investigations done by OSHA, as well as by EPA, that gathered an incredible amount of information about the actuality, the facts on the ground of that refinery, which were profoundly different from the representations that Lime Tree made to obtain the Powell permit. Well, again, many of the explanations suggest that in 2018 when they were operating, they really weren't operating. It's kind of like the rest of those looking glass here. Either they were operating in 2018, or they weren't operating in 2018. You're saying they were operating in 2018, but something happened to convince the EPA that, well, they weren't really operating. They were just operating. Again, chronology is incredibly important. In 2018, Lime Tree was engaging in some construction to try to bring the facility up to a point where it could try to restart. It had not been maintained, essentially, since it was shut down in 2012. It was utterly decrepit. They spent $4 billion in three years trying to get it to a point where it could try to restart at the end of 2020. But each time they tried to restart, they had to shut down very quickly because they were fogging the island with toxic gas. Ms. Gange, if I could, you've said, in fact, three times that chronology is important. And I don't disagree with you, but isn't the real importance in the language of what was said in 2018 as compared to what was said in 2020? And going back a few minutes in your argument, I understood you to have said that what the EPA said in 2018, effectively, and I don't think you used the words not final, but it was a determination that was left open, so to speak, to further development. And isn't that really your answer? I mean, forget the chronology. We know the difference between 2018 and 2020, but either the EPA made a determination that it then reversed rather dramatically several years later, or it didn't. So can we concentrate on what was said and the import of what was said or not said? Thank you, Your Honor. The final page of that 2018 letter says unequivocally, this is not a final determination of whether or not the PSD program applies to this facility. They said we have only the information and representations that were made. We don't have enough information about the activities you want to engage in. And we specifically are not making a final PSD applicability determination that will come later based on information in a permit application. Well, what new construction occurred from 2018 until 11-03 of May, was it 24, 2023? What new construction has occurred at the facility? There was, Lion Tree spent three years and $4 billion trying to resurrect that facility. They were never able to successfully restart in the configuration that the plant reached. But that's not what would be the subject of a PSD permit. The PSD permits do not look backwards, they look forward. EPA's finding was that based on what they learned after they audited the facility, after these catastrophic failures, that there is a lot of work that would have to be done out at that facility for it to attempt to restart without fogging it up with toxic gas, creating pollution, et cetera. That work has not been done. When EPA issued this letter in November, it was their understanding that this facility was in the same shape that it was when Lion Tree shut it down and realized it could not start. There seems to be a couple of different things here. One, based upon what your colleague's assistant said, that it could be looking at the language only of 7475, that assumed for a moment argumentatively, that what Lion Tree wants to do is not new construction subjugate that requires a PSD, but is reopening a permit facility. But even under this condition, prior to them actually operating, you would have the authority not because of a PSD application, but just as a general, I guess, environmental regulation, outside of 7475, you would be entitled to do an audit and make a determination that before you do, you're putting this out, certain things need to be done. But that doesn't answer the question of whether or not the PSD is prerequisite to doing this. It simply means, as I understand it, that you could conduct an audit without the PSD. They could start without the PSD, try to start without the PSD, but you could audit them prior to the time they send out any emissions. Is that incorrect? Are you saying you could not audit them without a PSD? To clarify, in the emergency room, there was a prior enforcement action against Jovensa that resulted in a consent decree that requires a series of actions to be taken. There was a Clean Air Act Section 303 emergency action that was taken, and a joint stipulation that was filed with the district court here. And I assume, without interrupting you, that all the money that they had spent, I assume, is pursuant to compliance with that consent decree. It could be longer than that. It is our understanding that they have not yet tried to comply with the consent decree. The consent decree is still in force. It is in force. The bankruptcy order that allowed Port Hamilton to purchase this facility expressly required them in paragraph 10 of that bankruptcy order, expressly required them to become a party to the consent decree, and to become a party to the joint stipulation that was entered in the district court here. That joint stipulation is the document that requires notifications. Notifications before they start evading. But that is not PSD related. I know, but I'm saying a very simple resolution here. And I'm beginning to wonder why we're here. If there's a consent decree that requires them to do certain things before starting up, and pursuant to that decree, or maybe pursuant to the statute, you have the ability to come in and conduct an audit, a free study help audit, to see whether or not their restarting is going to result in emissions. You can do that without a problem, whether or not they need a PSD. You can rely on the consent decree. That is erroneous and misleading. The audits that are provided for in the joint stipulation are extraordinarily limited, and they're limited only to issues that were presenting an imminent and substantial endangerment to the employees of the refinery and St. Croix. They do not at all address the same issues as PSD. Had they complied with the consent decree, would EPA have allowed them to operate? No, they need a PSD permit. Is that part of the consent decree? The consent decree was issued in 2012, and it addressed Clean Air Act violations by Homensa back in 2011 and 2012. Those issues have never been addressed, but that does not take the place of a PSD permit. They need one. You probably remember that here. They assume they need the PSD permit, and whether or not they comply with the consent decree, they still have to get the PSD permit, but that's the issue of awards. Complying with the consent decree would only help address historic issues that were Clean Air Act violations 10 to 12 years ago. A PSD permit today would look at this facility, which has functionally not been a major stationary source since 2012. It hasn't been refining petroleum. This idling that they talk about is running wastewater and the emergency electrical system for that facility. It's not refining. For 12 years, there have been no emissions from that facility. No such activity has been taken into account. Council, could I return you to the Chevron issue? Am I correct that this case on appeal really is a battle, in the first instance, over whether or not the statute itself is ambiguous, such that the agency has an opportunity to opine, if you will, on the way in, which is to focus you on Skidmore deference? Is that something we should be looking at? The agency construed the term new major stationary source in its regulation as the authority for the action that it took. That really was not what I asked you. Isn't that the focus of this appeal, and don't you need to come to grips with Port Hamilton's position that the statute is not ambiguous? Yes, Your Honor. EPA believes that Section 7475 and Section 7479C3, the definition of construction, they do not speak clearly to the question of whether a facility that has essentially not been a major stationary source for years because it was mothballed and not maintained and is not capable of fulfilling its function, which is refining. If there has to be construction done to restart such a facility... I assume that that is an argument, a recitation, that that is a statement suggesting that the statute is indeed ambiguous, that that's your position? That is correct. All right. Now, assuming that that's your position, I think we have been taught by the Supreme Court, and as recently as 2019 with the Kaiser decision, that when that is being... when that's the question being addressed, that the argument needs to employ all of the tools in the toolkit, which includes legislative history. Where do you discuss legislative history in your briefing? Your Honor, this is an unusual case. That too was not my question. Well, it's unusual because the definition of construction is only partial. It's only partial because it says new construction. It was added by a technical amendment. It was not added as part of the main text of the application. Well, what difference... I mean, technical amendments have a very, very definite purpose to them. Congress revisits everything from incorrect punctuation to word usage sometimes, but technical amendments are not unusual. They occur with some degree of regularity, especially with major legislation. So how does that answer my question as to whether or not you took on legislative history here in your briefing? Because I will be very candid. It seems to me the legislative history may very well redound to the benefit of Port Hamilton here. Your Honor, when EPA was construing its regulation and looking back to Section 7475 and 7479, the agency doesn't dispute that that facility was originally constructed in the 1960s. It was. The issue that the agency's grappling with is that it was shut down in 2012 and it was not maintained. But the statute does not incorporate that concept into what is meant for construction or what is required for PSP. What you're basically saying is that Congress, when they defined 7475 and its progeny, what they meant to require for PSP, they didn't go far enough. But they gave a definition, and I'm not sure that the agency can now go along and use its hindsight to fix that definition. Congress has to fix that definition. Your Honor, EPA agrees wholeheartedly that Congress did not speak directly to the issue that's confronting the agency. But when Congress has not directly spoken to an issue, and it's ambiguous in perspective. Construction is defined as any physical change or change in the method of operation, including fabrication, erection, installation, demolition, or modification of an admissions unit that would result in a change in admissions. And then there's a disjunctive there. And you're not arguing that the situation that this refinery fits within that. You're saying that – I'm not quite sure what you're saying. What the agency is saying is that this is a new facility upon restart because – But that's not what the statute says. That's my point. You could argue that if it sat idle for a while and then restarts, the thing that restarts is subjectively and qualitatively different than what went normally. And it is therefore a new construction. Congress could define the term construction to include restarting a previously demolished facility. But it didn't do that. If it didn't do that, why is it the agency's decision to do that over the properties? Your Honor, the EPA view – if we step back and take a look at this in the context of the PSD program, which is what the statute – Because we only do that if the PSD program applies. And it applies, too, depending on whether or not you fit within 74 or 75. I'm trying to get you to help me understand how something that you're not even arguing is new construction is nevertheless new construction. We believe that that facility itself is new for purposes of the PSD program, not a construction contractor is going to build a building. But as an agency administering the PSD program, reading the statute or provision – You're saying it's part of the PSD program because you say it's part of the PSD program. It is an exception. That's what you're arguing. It is that way because everybody says it's that way. And you're also saying it's new because we think it's new. So let me ask you the same question I asked your colleague. What do we do with the Supreme Court's recently accepted cert lower? How does that apply to this case today? We do not believe that that applies to this case. I mean, as this case is going to be decided, Chevron is still good law. And we believe that if the agency's construction of its regulation is reasonable and – If the statute is ambiguous. Unless Chevron never does apply. You've got to start with the fact that the statute is ambiguous to get to Chevron never. And your position is that you want us to accept your interpretation of what new means. We do. And to be clear, Your Honor, we're not seeking Chevron deference for the regulatory construction that's been made. Well, that gets us to the our deference question, doesn't it? Isn't that what you're moving to? No, we're not seeking our deference either. And I apologize if the briefing was unclear, but the agency's argument is that many years ago, 5221 filled the gap in the statute. Today, we're applying Section 5221. The agency's construction of that regulatory provision was made fulsomely in the letter, which is challenged under the Administrative Procedure Act. Reduced to its essence, you want us to interpret the statute consistent with your definition in that year's EPA's definition of new. Correct? Tell them where you were. The agency believes that Congress did not speak to this specific issue in 7475 and 7479, and that in that instance, if the agency makes a reasonable construction, then that is entitled to... That's the wonderland kind of argument. Congress didn't speak to it only because what is happening here falls outside the definition of construction that Congress gave. So if that's your definition of when Chevron applies, then there's no such thing as an alternative to why we use action by the agency, because whenever the agency acts, if the action is not covered by the statute, well, that's because Congress didn't speak to the issue, and therefore, we're filling the gap. That cannot be the law. And our argument today is that the agency's construction of the term new major stationary source is reasonable in the context of the PSD program and the regulatory program as a whole that was promulgated back in 2002. Judge Smith? I have nothing further to thank you. Thank you. Thank you very much. Can you just readjust the mic, Mr. Sesto? Yes. Can you hear me well? I'd like to make just a couple of points. On the 2018 determination and whether or not it was final, it was final on the determination that the refinery had been in idle status since 2012. As we've been discussing, if there's a major modification, we would still be subject to PSD, a major modification as defined by the statute, because that would increase the emissions. The letter says, we don't know what your, quote, planned projects are. And basically, until we know that, we don't know whether PSD will apply. So that's an independent way for PSD to apply. The agency has said, it doesn't apply based upon idle status, but show us your plans, and you still might be subject to it. That's a reasonable and really the only proper reading of the 2018 determination. It's the only fair reading of what the EPA put in the bankruptcy reading room, because they didn't say, we're reconsidering the 2018 determination status on idle status. It just said, you may be subject to PSD. Can you talk a little bit about the overlay thing between this consent decree that was referenced and why we're here? Sure. Port Hamilton is subject to the consent decree. It is also required to join the joint stipulation. As we say in our brief, we have no problem joining it. There are some issues, because deadlines have shifted because of the bankruptcy and everything else. But we have no problem signing on to the joint stipulation. There is a detailed steps that are set forth at the time, what Full Red Line Treat Bay had to do, and now what Port Hamilton would have to do to restart the refinery. And PSD is not one of the things listed in there. But there is ample authority, not just in the consent decree and the joint stipulation, but in EPA's general powers of regulation to ensure that this refinery will operate as Port Hamilton intends to operate it, which is safely and without endangering the community. And on that point, the EPA has pointed to the photos that they put in the brief and the study that they did. Well, they came in and they did a study of certain units in the refinery. And they took pictures. And they said, we have concerns about these. And in the record, the Elysium report goes through. And that audit addressed all 90 areas of concern identified by the EPA. This is an independent audit. It found the mechanical integrity of the structures of the refinery. But based both on the internal and external corrosion, which the photos only show external corrosion, it found that Port Hamilton had a more conservative approach to mechanical integrity than is required by industry standards, and that all of the 90 spots indicated by the EPA met those requirements. So there's every indication that Port Hamilton will indeed operate this refinery safely and in an environmentally appropriate manner. And the EPA has plenty of power to ensure that that happens without imposing a standard that is intended to be applied under the construction practice. Is that it? Yes, sir. Nothing further. Thank you. Thank you very much, sir. Thank you.